[Cite as *Ohio Democratic Party v. LaRose*, 2020-Ohio-4778.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ohio Democratic Party et al., | : | |
| Plaintiffs-Appellees, | : | |
| v. | : | No. 20AP-432 |
| | | (C.P.C. No. 20CV-5634) |
| Frank LaRose, in his official capacity as Ohio Secretary of State, | : | |
| | | (ACCELERATED CALENDAR) |
| Defendant-Appellant. | : | |
| Ohio Democratic Party et al., | : | |
| Plaintiffs-Appellees, | : | |
| v. | : | No. 20AP-439 |
| | | (C.P.C. No. 20CV-5634) |
| Frank LaRose, in his official capacity as Ohio Secretary of State, | : | |
| | | (ACCELERATED CALENDAR) |
| | : | |
| Defendant-Appellee, | : | |
| [The Ohio Republican Party, | : | |
| Intervenor-Appellant]. | : | |
| | : | |

D E C I S I O N

Rendered on October 2, 2020

**On brief:** *McTigue & Colombo, Derek S. Clinger, Donald J. McTigue,* and *J. Corey Colombo*, for plaintiffs-appellees. **Argued:** *J. Corey Colombo.*

**On brief:** *Dave Yost,* Attorney General, *Benjamin M. Flowers, Stephen P. Carney, Bridget C. Coontz,* and *Halli Brownfield Watson*, for defendant-appellant Frank LaRose,

in his official capacity as Ohio Secretary of State. **Argued:** *Stephen P. Carney.*

**On brief:** *Jones Day,* and *Edward M. Carter*, for intervenor-appellant The Ohio Republican Party. **Argued:** *Edward M. Carter.*

**On brief:** *Zach Klein*, City Attorney, *Richard N. Coglianese,* and *Alana Valle Tanoury*, Assistant City Attorneys, for amicus curiae City of Columbus; *Andrew W. Garth*, Interim City Solicitor, for amicus curiae City of Cincinnati; *Eve V. Belfance*, Director of Law for City of Akron, for amicus curiae City of Akron; *Dale Emch*, Law Director for City of Toledo, for amicus curiae City of Toledo; *Fritz Byers*, for amicus curiae Board of Lucas County Commissioners; *Michael C. O'Malley*, Prosecuting Attorney, and *David G. Lambert*, Assistant Prosecuting Attorney, for amicus curiae Cuyahoga County, Ohio; and Montgomery County Commissioners Judy Dodge, Deborah A. Lieberman, and Carolyn Rice, *pro se*, all on joint brief as *amici* in support of plaintiffs-appellees.

APPEALS from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} The Ohio Democratic Party and Lewis Goldfarb challenge the Secretary of State's interpretation of R.C. 3509.05 and seek to enjoin Directive 2020-16. We agree with the trial court that the Secretary's interpretation of R.C. 3509.05 is not reasonable and that the statute neither prescribes nor prohibits ballot drop boxes at locations other than the boards of elections. However, unlike the trial court, we do not find injunctive relief against the directive to be appropriate. The directive does not violate R.C. 3509.05, and, in this case, appellees do not raise any other statutory or constitutional challenges to the directive. As will be explained more fully below, we find that while the Secretary was not statutorily required to limit the location of drop boxes as he did in Directive 2020-16, he was also not statutorily required to allow additional drop boxes. If, as appellees argue, the Secretary wants to permit additional drop boxes, he has the authority to do so and nothing in this decision prohibits him from rescinding Directive 2020-16 and issuing a new directive accordingly.

## I. Facts and Procedural History

{¶ 2} Defendant-appellant, Frank LaRose, in his official capacity as Ohio Secretary of State, appeals from (1) an entry of the Franklin County Court of Common Pleas issuing a declaratory judgment as requested by plaintiffs-appellees, Ohio Democratic Party ("ODP") and Lewis Goldfarb, a qualified elector of Franklin County and (2) an entry of the Franklin County Court of Common Pleas granting a preliminary injunction enjoining the enforcement of the Secretary of State's Directive 2020-16 related to the use of ballot drop boxes by county boards of elections. Intervenor-appellant, the Ohio Republican Party ("ORP"), also appeals from the declaratory judgment and the granting of the preliminary injunction. In response to the global coronavirus pandemic, the Ohio General Assembly passed a COVID-19 relief bill, 2020 Am.Sub.H.B. No. 197, containing, among many other measures, a temporary provision for the 2020 primary election requiring each county board of elections to install and use a drop box to facilitate the return of absentee ballots. 2020 Am.Sub.H.B. No. 197, Section 32(C); Section (E)(1). On August 12, 2020, in the lead-up to the 2020 general election, the Secretary issued Directive 2020-16 instructing all Ohio county boards of elections to continue using the drop boxes that were installed for the primary. Specifically, the directive stated:

> Boards of elections must continue to use the drop box that was installed outside each board of elections pursuant to H.B. 197 for the 2020 Primary Election for the November 3, 2020 election cycle for the return of absentee ballot applications and ballots. Beginning September 1, 2020, boards of elections must begin to provide voters with 24/7 access to the drop box, which will of course, already be securely monitored. Boards of elections are prohibited from installing a drop box at any other location other than the board of elections.

(No. 20AP-432, Directive 2020-16.)

{¶ 3} On August 25, 2020, ODP and Goldfarb filed a complaint seeking declaratory judgment and temporary and permanent injunctive relief enjoining the enforcement of the Secretary's instruction in Directive 2020-16 that prohibits county boards of elections from installing additional absentee ballot drop boxes at locations other than the county elections boards' offices. Specifically, appellees sought a declaratory judgment that:

> Declare[s] that Ohio law, including R.C. 3509.05, does not limit the number or locations of secure drop boxes that the county

> boards of elections may provide to the voters of their respective counties, and does not limit Defendant Secretary from instructing boards of elections that they may have multiple drop boxes at alternate locations * * *.

(No. 20AP-432, Aug. 25, 2020 Compl. at 14.) Additionally, ODP and Goldfarb filed a motion for temporary restraining order and preliminary injunction enjoining enforcement of the portion of Directive 2020-16 prohibiting county boards of elections from installing additional drop boxes.

{¶ 4} On August 31, 2020, ORP, Donald J. Trump for President, Inc., the Republican National Committee, and the National Republican Congressional Committee filed a joint motion to intervene as party defendants. Following a status conference, the trial court granted intervention to ORP but denied intervention as to Donald J. Trump for President, Inc., the Republican National Committee, and the National Republican Congressional Committee, finding ORP's participation would fully protect any interest in the matters those entities may have. In that same journal entry, the trial court denied appellees' request for a temporary restraining order and scheduled a hearing on appellees' motion for a preliminary injunction for September 11, 2020. Prior to the hearing, the trial court granted leave to various municipalities and county commissioners to file amici briefs in support of appellees' motion for preliminary injunction.

{¶ 5} On September 8, 2020, the Secretary filed a combined motion to dismiss and memorandum in opposition to preliminary injunctive relief. In the motion to dismiss, the Secretary argued that because appellees sought a declaration regarding what non-party county boards of elections may do, their request was for an advisory opinion, not a claim for declaratory relief. Thus, the Secretary argued appellees failed to state a claim for relief and that appellees lacked standing. ORP similarly filed a motion for judgment on the pleadings, asserting appellees lacked standing to seek a declaratory judgment.

{¶ 6} Appellees sought to compel testimony from the Secretary of State at the preliminary injunction hearing. In response to the subpoena, the Secretary filed a September 8, 2020 motion to quash stating that, in lieu of appearing to testify, he was willing to stipulate to the following:

> 1. The Secretary of State interprets R.C. 3509.05 and other provisions of Ohio law as permitting a voter to return their

> ballot only by mail or by delivering it to the director [of their board of elections]. As the director is located at the board of elections, there can be a drop box only at the board of elections.
>
> 2. As a policy preference, the Secretary supports the county boards of election installing additional secure drop boxes, but only pursuant to bipartisan standards prescribed in law by the General Assembly that would apply uniformly in every Ohio county and that are consistent with the Equal Protection clause.

(No. 20AP-432, Sept. 8, 2020 Mot. to Quash at 5.) Ultimately, the Secretary did not testify at the hearing and these proposed stipulations were not agreed to by the appellees, but the Secretary referred to these proposed stipulations again in a post-judgment reply to a motion to show cause.

{¶ 7} The trial court conducted a hearing on the preliminary injunction on September 11, 2020 during which Goldfarb and Gregory Beswick, the executive director of ODP, provided testimony and the parties submitted numerous exhibits and affidavits of various election officials from around the state. Following the hearing, the parties submitted post-hearing briefs. On September 15, 2020, the trial court issued an opinion determining that the word "deliver" as used in R.C. 3509.05(A) is ambiguous. (No. 20AP-432, Sept. 15, 2020 Opinion at 29.) The trial court thus granted a declaratory judgment that:

> * * * R.C. 3509.05(A) permits county boards of election to obtain and use ballot drop boxes consistent with voting security arrangements specified by the Secretary. The court further finds that the Secretary had legal authority to require at least one box to be used in each county for the 2020 general election, as set forth in Directive 2020-16. * * *.
>
> The evidence offers no explanation for the Secretary's separate determination in Directive 2020-16 that "Boards of elections are prohibited from installing a drop box at any other location other [sic] than the board of elections." As a result, the court finds that in the present context of the 2020 general election this restriction is arbitrary and unreasonable. This restriction blocks individual county boards of elections from even considering the use of more than one drop box, or placing boxes at locations separate from board offices. Given the ambiguity of R.C. 3509.05(A), this is not required by law.

> Instead, every board of elections is legally permitted to consider enhancing safe and convenient delivery of absentee ballots, and may tailor ballot drop box locations or conceivably other secure options to the needs of their individual county.

(Opinion at 29.)  The trial court further reasoned that although the Secretary of State has broad discretion to issue directives to local boards of elections, "his actions must be reasonable to be legally enforceable.  Wholly arbitrary rules are entitled to no deference." (Opinion at 29.)

{¶ 8}   The next day, on September 16, 2020, the trial court issued an entry granting appellees' motion for a preliminary injunction and granting a stay of the preliminary injunction pending appeal.  The trial court reasoned that because it had found in its opinion on the declaratory judgment that allowing boards of elections to use more than one ballot drop box per county is lawful, the Secretary's Directive 2020-16 was therefore "legally unsupportable" as it prohibited individual boards of elections from using more than one drop box.   (No. 20AP-432, Entry at 1.)   The trial court found that appellees had demonstrated the criteria to be entitled to a preliminary injunction, and thus granted a preliminary injunction as follows:

> The Secretary of State, his agents, employees, attorneys and all those persons in active concert or participation with him who receive actual notice of this order, must immediately cease enforcing the limitation of one absentee ballot drop box per county set out in the Secretary's August 12, 2020 Directive 2020-16, or any variant of that Directive imposing any arbitrary limitation on the number or location of secure drop boxes that individual county boards of election may employ for the November 3, 2020 general election.
>
> Further, the Secretary shall not issue any new Directive or restriction to boards of elections which circumvent this order, or prevent individual boards from considering and adopting arrangements other than drop boxes that a board concludes are secure and appropriate to enhance absentee voting in their individual county.

(Entry at 3.)

{¶ 9}   The Secretary of State and ORP each filed separate, timely notices of appeal. In a September 18, 2020 journal entry, this court consolidated the cases for purposes of

appeal. Additionally, this court expedited the briefing, oral argument, and determination of the consolidated appeals.

## II. Assignments of Error

{¶ 10} The Secretary of State assigns the following errors for our review:

[1.] The trial court erred by issuing the declaratory judgment in this case, as the court wrongly declared that the Ballot Delivery Law, R.C. 3509.05, allows county boards of elections to install as many dropboxes as they like in as many places as they like.

[2.] The trial court erred in enjoining the Secretary of State's Directive 2020-16.

ORP assigns the following errors for our review:

[1.] The trial court erred in holding that Plaintiffs have standing when the possibility that their requested relief will redress their harm is speculative.

[2.] The trial court erred by using anecdotal evidence and its views of sound public policy to reject the Secretary's reasonable interpretation of R.C. 3509.05.

[3.] The trial court erred in using its declaratory judgment ruling to enjoin Directive 2020-16 in the absence of any legal claim that Directive 2020-16 violates the Ohio Constitution, Ohio law, or any federal law.

[4.] The court erred in holding that the remaining equitable factors weighed in favor of an injunction.

## III. ORP's First Assignment of Error – Standing

{¶ 11} In its first assignment of error, ORP argues the trial court erred in holding appellees have standing to bring their declaratory judgment and injunctive relief action. Because an argument that a party lacks standing involves a court's jurisdiction to hear the case, we address this argument first.

{¶ 12} Pursuant to Article IV, Section 1 of the Ohio Constitution, the "judicial power of the state is vested in a supreme court, courts of appeals, courts of common pleas and divisions thereof, and such other courts inferior to the Supreme Court as may from time to time be established by law." Article IV, Section 4(B) of the Ohio Constitution provides that

the "courts of common pleas and divisions thereof shall have such original jurisdiction over all justiciable matters and such powers of review of proceedings of administrative officers and agencies as may be provided by law."

{¶ 13} Standing to sue is part of the common understanding of what makes a case justiciable and is considered a "jurisdictional requirement." *Fed. Home Loan Mtge. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, ¶ 21-22. "It is fundamental that a party commencing litigation must have standing to sue in order to present a justiciable controversy." *Id*. at ¶ 41. Thus, "[b]efore an Ohio court can consider the merits of a legal claim, the person or entity seeking relief must establish standing to sue." *Ohio Pyro, Inc. v. Ohio Dept. of Commerce, Div. of State Fire Marshal*, 115 Ohio St.3d 375, 2007-Ohio-5024, ¶ 27; *see Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, ¶ 23 ("[i]t is well settled that standing does not depend on the merits of the plaintiff's contention that particular conduct is illegal or unconstitutional. Rather, standing turns on the nature and source of the claim asserted by the plaintiffs"). Whether a party has established standing to bring an action before the court is a question of law reviewed de novo on appeal. *Cuyahoga Cty. Bd. of Commrs. v. State*, 112 Ohio St.3d 59, 2006-Ohio-6499, ¶ 23.

{¶ 14} Ohio courts are not bound by federal standing principles derived from Article III of the United States Constitution's "cases" and "controversies" requirement. *Leppla v. Sprintcom, Inc.*, 156 Ohio App.3d 498, 2004-Ohio-1309, ¶ 30 (2d Dist.), citing Article III, Section 2, U.S. Constitution. However, Ohio courts generally adhere to the traditional principles of standing that "require litigants to show, at a minimum, that they have suffered '(1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) likely to be redressed by the requested relief.' " *ProgressOhio.org., Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, ¶ 7, quoting *Moore* at ¶ 22, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see State ex rel. Walgate v. Kasich*, 147 Ohio St.3d 1, 2016-Ohio-1176, ¶ 23 ("[t]he test for Article III standing, like the test for common-law [standing] in Ohio, requires an injury in fact, causation, and redressability"). These three requirements are considered the " 'irreducible constitutional minimum' " of standing. *Moore* at ¶ 22, quoting *Lujan* at 560.

{¶ 15} ORP argues appellees lack standing because they are unable to demonstrate they have a concrete injury that is likely to be redressed by the requested relief. However,

we agree with the trial court that ODP has standing on its own and that the concept or organizational standing applies to confer standing on a political party to challenge an election law on behalf of its members. *See Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir.2007) (finding a political party has standing to challenge an Indiana voting law), *aff'd on other grounds*, 553 U.S. 181, 189 (2008), fn. 7 (stating "[w]e also agree with the unanimous view of [the judges of the Seventh Circuit] that the Democrats have standing to challenge the validity of" the voting law); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir.2004) (concluding the county democratic party had "standing to assert, at least, the rights of their members who will vote in the November 2004 election" in a challenge to an election directive issued by the Ohio Secretary of State). *See also Common Cause Indiana v. Lawson*, 937 F.3d 944, 950 (7th Cir.2019) ("[a] voting law can injure an organization enough to give it standing by compelling [it] to devote resources to combatting effects of that law that are harmful to the organization's mission") (internal quotations omitted), citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) (recognizing organizational standing). Because we conclude ODP has standing, we need not reach the question of whether Goldfarb, individually, has standing. *Dept. of Commerce v. United States House of Representatives*, 525 U.S. 316, 330 (1999) (noting that "the presence of one party with standing assures that controversy before Court is justiciable"); *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), fn. 2 (stating the "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement").

{¶ 16} Accordingly, we overrule ORP's first assignment of error.

## IV. Secretary of State's First Assignment of Error and ORP's Second Assignment of Error – Declaratory Judgment

{¶ 17} In his first assignment of error, the Secretary argues the trial court erred in granting appellees' requested declaratory judgment. Similarly, in its second assignment of error, ORP argues the trial court erred in issuing the declaratory judgment. Because the Secretary and ORP present related arguments, we address these two assignments of error jointly. Both the Secretary and ORP assert the trial court erroneously interpreted R.C. 3509.05.

{¶ 18} "A declaratory judgment action is a civil action and provides a remedy in addition to other legal and equitable remedies available." *Burge v. Ohio Atty. Gen.*, 10th Dist. No. 10AP-856, 2011-Ohio-3997, ¶ 7, citing *Victory Academy of Toledo v. Zelman*, 10th Dist. No. 07AP-1067, 2008-Ohio-3561, ¶ 8. " 'The essential elements for declaratory relief are (1) a real controversy exists between the parties, (2) the controversy is justiciable in character, and (3) speedy relief is necessary to preserve the rights of the parties.' " *Id.*, quoting *Walker v. Ghee*, 10th Dist. No. 01AP-960, 2002 Ohio App. LEXIS 252 (Jan. 29, 2002). On appeal, this court reviews a trial court's determination of justiciability of a declaratory judgment claim for an abuse of discretion; however, once a matter is found to be appropriate for declaratory judgment, an appellate court reviews a trial court's holdings regarding questions of law under a de novo standard. *Youngstown City School Dist. Bd. of Edn. v. State*, 10th Dist. No. 17AP-775, 2018-Ohio-2532, ¶ 8, citing *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, ¶ 13. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

## A. Justiciability

{¶ 19} We begin by noting that both the Secretary and ORP argue that declaratory judgment is not appropriate here because appellees have not demonstrated that a real controversy or justiciable issue exists between the parties. "For purposes of a declaratory judgment action, a 'justiciable issue' requires the existence of a legal interest or right, and a 'controversy' exists where there is a genuine dispute between parties with adverse legal interests." *Festi v. Ohio Adult Parole Auth.*, 10th Dist. No. 04AP-1372, 2005-Ohio-3622, ¶ 11, citing *Wilburn v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 01AP-198, 2001 Ohio App. LEXIS 5253 (Nov. 27, 2001). The Secretary and ORP assert appellees have alleged only speculative or hypothetical injury as appellees are not the entities who would be responsible for installing and maintaining additional drop boxes. As the Secretary and ORP note, that responsibility would lie with the individual boards of elections. Appellees respond that the controversy is not the attempted installation of more drop boxes; rather, they argue the controversy is the meaning of R.C. 3509.05.

{¶ 20} In considering whether there existed a justiciable controversy suitable for declaratory judgment, the trial court looked to the prospective harm that could be caused

by not clarifying the meaning of R.C. 3509.05 prior to the November 2020 election. The trial court relied on federal case law for the proposition that courts "have excused definitive proof where the injury was impossible to prove with absolute certainty * * * or where the injury could not be 'specifically identified in advance.' " *Tennessee Republican Party v. Securities & Exchange Comm.*, 863 F.3d 507, 517 (6th Cir.2017), quoting *Sandusky Cty. Democratic Party* at 574; *see also Dept. of Commerce v. New York*, 588 U.S. ___, 139 S. Ct. 2551, 2566 (2019) (noting Article III standing "requires no more than de facto causality," and standing can rely "on the predictable effect of Government action on the decisions of third parties"). Though we caution against the risk of conflating the concept of standing with the concept of justiciability in the context of declaratory judgment, we nonetheless agree with the trial court that in the specialized context of election law cases, these principles can overlap. Thus, we find the trial court did not abuse its discretion in determining appellees presented a justiciable issue suitable for declaratory judgment.

### B. Statutory Interpretation

{¶ 21} We turn now to the trial court's interpretation of the relevant statute and its issuance of the declaratory judgment. Under Ohio's system of no-fault absentee voting, any qualified elector may vote by absentee ballot at an election. R.C. 3509.02. Once a voter has requested, received, completed and signed the absentee ballot, R.C. 3509.05 directs the manner of submitting the absentee ballot to the board of elections. Specifically, R.C. 3509.05(A) provides that, after placing the absentee ballot in an identification envelope:

> The elector shall mail the identification envelope to the director from whom it was received in the return envelope, postage prepaid, or the elector may personally deliver it to the director, or the spouse of the elector, the father, mother, father-in-law, mother-in-law, grandfather, grandmother, brother, or sister of the whole or half blood, or the son, daughter, adopting parent, adopted child, stepparent, stepchild, uncle, aunt, nephew, or niece of the elector may deliver it to the director.

Further, R.C. 3509.05(A) provides "[t]he return envelope shall be transmitted to the director in no other manner, except as provided in section 3509.08 of the Revised Code," which relates to absent voter's ballots of those electors who are disabled, hospitalized, and confined.

{¶ 22} There is not an election statute that directly addresses the use of drop boxes, but the Secretary of State has the authority, under R.C. 3501.05(B) and (C), to implement the election laws by issuing instructions through directives to the boards of elections as to the proper method of conducting elections. The question presented in appellees' declaratory judgment action is whether R.C. 3509.05(A) limits the personal delivery of absentee ballots to a single location. Specifically, the Secretary and ORP argue the statute requires personal delivery of absentee ballots to occur only at the office of the board of elections. Appellees, on the other hand, argue the statute's silence on the location for return of absentee ballots means drop boxes at locations other than the board of elections are permissible.

{¶ 23} Statutory interpretation is a question of law subject to de novo review. *State v. Fraternal Order of Police of Ohio, Inc., Ohio Labor Council, Inc.*, 10th Dist. No. 16AP-457, 2017-Ohio-1382, ¶ 12, citing *Licking Hts. Local School Dist. Bd. of Edn. v. Reynoldsburg City School Dist. Bd. of Edn.*, 10th Dist. No. 12AP-579, 2013-Ohio-3211, ¶ 9. A court's duty is to give effect to the words used in a statute, not to delete or insert words. *State v. Maxwell*, 95 Ohio St.3d 254, 2002-Ohio-2121, ¶ 10. "Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning there is no occasion for resorting to rules of statutory interpretation. An unambiguous statute is to be applied, not interpreted." *Sears v. Weimer*, 143 Ohio St. 312 (1944), paragraph five of the syllabus.

{¶ 24} In ascertaining the meaning of a statute, a court's paramount concern is legislative intent. *State v. Jackson*, 102 Ohio St.3d 380, 2004-Ohio-3206, ¶ 34, citing *State ex rel. Asberry v. Payne*, 82 Ohio St.3d 44, 47 (1988). To discern legislative intent, a court first considers the statutory language, "reading words and phrases in context and construing them in accordance with rules of grammar and common usage." *State ex rel. Choices for South-Western City Schools v. Anthony*, 108 Ohio St.3d 1, 2005-Ohio-5362, ¶ 40.

{¶ 25} The issue here is the meaning of the word "deliver" as used in R.C. 3509.05(A). The parties agree that the statute is silent as to whether "deliver" must mean returning the ballot only to the board of elections or whether it contemplates some other location for delivery. Generally, a court cannot add a requirement that does not exist in a

statute. *State ex rel. Colvin v. Brunner*, 120 Ohio St.3d 110, 2008-Ohio-5041 ¶ 45, citing *State ex rel. Columbia Reserve Ltd. v. Lorain Cty. Bd. of Elections*, 111 Ohio St.3d 167, 2006-Ohio-5019, ¶ 32 ("[w]e will not add a requirement that does not exist in the statute").

{¶ 26} Despite the statute's silence on the ballot drop boxes, the Secretary of State maintains that R.C. 3509.05(A) permits county boards of elections to install a drop box *only* at the county board of elections' offices. The Secretary argues that even if this court determines the statute is ambiguous as to the meaning of "deliver," his interpretation of the statute's meaning is entitled to deference. Where an election law is subject to two different, but equally reasonable, interpretations, a court must defer to the Secretary's interpretation of the election law. *State ex rel. Heffelfinger v. Brunner*, 116 Ohio St.3d 172, 2007-Ohio-5838, ¶ 57, citing *Whitman v. Hamilton Cty. Bd. of Elections*, 97 Ohio St.3d 216, 2002-Ohio-5923, ¶ 22. The key inquiry, therefore, is whether the Secretary of State's interpretation of the statute is reasonable.

{¶ 27} The Secretary argues that when the statute provides that an absentee ballot may be personally delivered "to the director," that phrase must mean to the director only at the county board of elections' office. In support, the Secretary points to R.C. 3509.04, which requires each director to pre-print his or her official address on the return envelope to be included with the absentee ballot. Thus, in R.C. 3509.05(A), the Secretary argues the requirement for *mailed* ballots "to the director" can be only to this one address. According to the Secretary, it must follow that if mailed ballots must be sent to that address, the *personally delivered* ballots must also be delivered only to one location.

{¶ 28} There are several flaws in the Secretary's interpretation of R.C. 3509.05. First, to accept the Secretary's interpretation, we would have to be willing to read the statute as using the term "mail" interchangeably with the term "personally deliver." A plain reading of the statute does not support an approach that would treat those two terms interchangeably. Moreover, the General Assembly has demonstrated it knows how to clearly impose a restriction to one location for election activities. For example, R.C. 3501.10(C) provides for early, in-person voting at only one location in the county. And elsewhere in R.C. 3509.05(A), the statute refers to the completion of an absentee ballot "at the office of the board." When the legislature uses different terms, a court must give each of them meaning. *See Maxwell* at ¶ 10 (a court's duty is to give effect to the words used in

a statute, not to delete or insert words). *See also State v. Wilson*, 77 Ohio St.3d 334, 336 (1997) ("[i]n reviewing a statute, a court cannot pick out one sentence and disassociate it from the context, but must look to the four corners of the enactment to determine the intent of the enacting body"). The statute does not state "personally deliver to the director at the office of the board of directors," nor does it state "personally deliver to the director at the address printed on the identification envelope." The Secretary is urging an interpretation of the statute that uses terms interchangeably and adds language.

{¶ 29} Second, the Secretary's proffered interpretation of the statute relies on an unduly technical reading of the term "deliver" that is internally inconsistent. In his brief, the Secretary concedes that personal delivery necessarily implies some transfer from an agent of the director to the director. He acknowledges that the personal delivery requirement would not require handing the completed absentee ballot to the director of a board of elections face-to-face but could be accomplished by handing the ballot to a board of elections employee at the board of elections office. Additionally, the Secretary agrees that personal delivery to the director could be accomplished by the use of *one* drop box located at the board of elections office, even setting forth in Directive 2020-16 a procedure by which "at least one Republican and one Democratic member of the board or board staff must together retrieve the drop box's contents at least once daily." (Directive 2020-16.) The Secretary asserts that process of ballot retrieval for one drop box satisfies the statute's requirement for personal delivery to the director, but he does not convincingly explain how the statute's silence on the use or placement of drop boxes that are in the custody and control of the director of a board of elections but at a physical location other than the board of elections offices compels the conclusion that the statute necessarily prohibits the use of such drop boxes in other locations. If a board of elections is willing to establish and maintain a drop box at a different physical location, the procedures the board follows to obtain the returned absentee ballots from within the drop box would still accomplish delivery to the director, as the statute requires. This is true whether the drop box is placed mere feet outside the board of elections office door or miles away. It would also be true whether a board of elections maintained one drop box or several.

{¶ 30} Third, the Secretary argues that because the identification envelope into which a completed absentee ballot must be placed is printed with the address of the board

of elections, then the use of any drop box can only occur at the board of elections. However, this argument is self-defeating as the statute does not require a board of elections' post office address to be the same as the board's physical office address. The Secretary acknowledges in his reply brief that the statutory scheme allows directors of boards of elections to use *both* their physical office address and a P.O. Box as an official address. The Secretary is not arguing that a person wishing to personally deliver a ballot in a county that utilizes an off-site P.O. Box as the address printed on the identification envelope would need to accomplish personal delivery only at the physical location of the P.O. Box or at the board of elections. But the Secretary does not explain why it necessarily follows that an off-site drop box, the contents of which would be retrieved by agents of the director and ultimately transmitted to the director, does not accomplish personal delivery. Thus, the Secretary's attempted analogy to the address printed on the identification envelope is unpersuasive.

{¶ 31} If the statute does not limit the use of drop boxes at locations other than the board of elections, and if a board of elections is willing to install drop boxes in other locations and keep them under the board of elections' control, we fail to see how returning a completed absentee ballot to such a drop box would not accomplish personal delivery of the absentee ballot under R.C. 3509.05(A). Although the statute does not require the placement of drop boxes at locations other than the board of elections, it also does not limit it. Thus, we find the Secretary of State's interpretation of R.C. 3509.05(A) to be unreasonable, and it is therefore not entitled to deference. Instead, we agree with appellees and the trial court that R.C. 3509.05(A) does not limit the number or locations of drop boxes that a board of elections may provide. We further agree with appellees and the trial court that R.C. 3509.05(A) does not limit the Secretary of State from instructing boards of elections that they may have multiple drop boxes at alternate locations in their respective counties.

{¶ 32} To be clear, and looking specifically to the declaration appellees requested, our interpretation of R.C. 3509.05(A) is that it does not limit the location or the number of drop boxes utilized by a board of elections. That interpretation should not be construed as imposing a *requirement* that a board of elections must utilize a definitive number of drop boxes, only that the statute does not limit it. Thus, we agree with the trial court's issuance of the declaratory judgment only with respect to the relief actually requested by appellees:

that the statue *does not limit* the location or number of drop boxes that a board of elections may provide, and that the statute *does not limit* the Secretary from instructing boards of elections that they may have multiple drop boxes at alternate locations. Therefore, we overrule the Secretary of State's first assignment of error and ORP's second assignment of error to the extent herein explained.

## V. Secretary of State's Second Assignment of Error and ORP's Third and Fourth Assignments of Error – Preliminary Injunction

{¶ 33} In his second and final assignment of error, the Secretary argues the trial court erred in granting the preliminary injunction. In its third and fourth assignments of error, ORP similarly argues the trial court erred in granting the preliminary injunction. As these assignments of error are related and present similar arguments, we address them jointly.

{¶ 34} In determining whether a preliminary injunction is warranted, a trial court looks to four factors: (1) whether the evidence presents a substantial likelihood that the plaintiff will prevail on the merits; (2) whether denying the injunction will cause the plaintiff to suffer irreparable injury; (3) whether granting the injunction will cause unjustifiable harm to third parties; and (4) whether the injunction serves the public interest. *Cuyahoga Re-Entry Agency v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-740, 2012-Ohio-2034, ¶ 31, citing *Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co., Gen. Commodities Div.*, 109 Ohio App.3d 786, 790 (1oth Dist.1996). Whether to grant or deny an injunction is a matter within the discretion of the trial court, and a reviewing court will not disturb the judgment of the trial court absent an abuse of discretion. *Garono v. State*, 37 Ohio St.3d 171, 173 (1988). An abuse of discretion connotes a decision that was unreasonable, arbitrary, or unconscionable. *Blakemore* at 219.

{¶ 35} Appellees assert they have demonstrated a substantial likelihood of success on the merits because they were successful in the declaratory judgment action. However, the declaratory judgment that appellees sought, and that we clarified in our resolution of the Secretary of State's first assignment of error and ORP's second assignment of error, was limited to the meaning of R.C. 3509.05(A). Appellees did not seek a declaratory judgment with respect to Directive 2020-16, and the declaratory judgment statute makes no mention of Secretary of State directives. R.C. 2721.03 (stating "any person whose rights, status, or

other legal relations are affected by a constitutional provision, statute, rule as defined in section 119.01 of the Revised Code, municipal ordinance, township resolution, contract, or franchise may have determined any question of construction or validity arising under" the same). Instead, appellees sought a permanent injunction enjoining the Secretary from enforcing the instruction in Directive 2020-16 that prohibits county boards of elections from installing additional drop boxes at locations other than the boards' offices. Thus, to be entitled to a preliminary injunction, appellees need to demonstrate they have a substantial likelihood of success on the merits of the claim for a permanent injunction.

{¶ 36} "A party seeking a permanent injunction 'must demonstrate by clear and convincing evidence that they are entitled to relief under applicable statutory law, that an injunction is necessary to prevent irreparable harm, and that no adequate remedy at law exists.' " *McDowell v. Gahana*, 10th Dist. No. 08AP-1041, 2009-Ohio-6768, ¶ 9, quoting *Acacia on the Green Condominium Assn., Inc. v. Gottlieb*, 8th Dist. No. 92145, 2009-Ohio-4878, ¶ 18. In order for this court to review the trial court's granting of the preliminary injunction, we must determine whether the trial court abused its discretion in determining that appellees demonstrated a substantial likelihood of success on their claim that the portion of the Secretary's Directive 2020-16 prohibiting the installation of additional drop boxes is a violation of applicable statutory law entitling them to a permanent injunction against that instruction's enforcement.

{¶ 37} In granting appellees' motion for preliminary injunction, the trial court confused the issue. Rather than focusing on the likelihood of success on the merits of the request for permanent injunction, the trial court instead found appellees had already demonstrated a likelihood of success on the declaratory judgment. This was the wrong analysis. Appellees' argument, that the trial court adopted, is that the Secretary's rationale for issuing Directive 2020-16 was unreasonable. However, disagreeing with the policy behind the directive is different than demonstrating the directive is in violation of the law or the constitution. Appellees have stipulated in this case that they are not asserting a constitutional challenge to the directive. Thus, our focus is whether appellees have demonstrated that Directive 2020-16 is in violation of the law.

{¶ 38} Significantly, the text of Directive 2020-16 makes no mention of the Secretary's interpretation of R.C. 3509.05(A). The directive does not contain a statement

that R.C. 3509.05(A) allows only one drop box; instead, it contains an instruction from the Secretary that boards of elections must use one drop box. The directive does not contain an explanation of the Secretary's policy considerations in issuing the instruction.

{¶ 39} Appellees point out that the Secretary repeatedly represented throughout the litigation that he believed R.C. 3509.05(A) required him to limit the use of a drop box to only the board of elections' offices. As we explained in our resolution of the declaratory judgment arguments, the Secretary's interpretation of R.C. 3509.05 was unreasonable. However, it bears repeating that even though R.C. 3509.05 does not limit the location or number of drop boxes and does not limit the Secretary from instructing boards of elections that they may have more than one drop box, the statute also does not require the use of any particular number of drop boxes, nor does the statute require that the Secretary instruct the boards of elections that they must use any particular number of drop boxes. A finding that R.C. 3509.05(A) does not limit the number or placement of drop boxes does not compel the conclusion that the Secretary cannot regulate the use of drop boxes. Indeed, he did just that in prescribing methods for monitoring the drop boxes and for accomplishing return of the drop box contents to the boards of elections.

{¶ 40} As the Supreme Court of Ohio has explained, "[t]he secretary of state is the chief election officer of the state" and "has many election-related duties." *State ex rel. Colvin* at ¶ 32, citing R.C. 3501.04 and 3501.05. Among the duties of the Secretary of State is to "[i]ssue instructions by directives and advisories in accordance with section 3501.053 of the Revised Code to members of the boards [of elections] as to the proper methods of conducting elections." R.C. 3501.05(B). Additionally, the Secretary of State has the duty to "[p]repare rules and instructions for the conduct of elections." R.C. 3501.05(C).

{¶ 41} Pursuant to that authority, the Secretary issued Directive 2020-16, which instructed that boards of elections (1) "must continue to use the drop box that was installed outside each board of elections pursuant to H.B. 197 for the 2020 Primary Election for the November 3, 2020 election cycle for the return of absentee ballot applications and ballots" with 24/7 voter access to the drop box beginning September 1, 2020, and (2) are "prohibited from installing a drop box at any other location other than the board of elections." (Directive 2020-16.) Appellees do not demonstrate that this instruction conflicts with R.C. 3509.05 or any other law. Appellees repeatedly state they were entitled

to the injunction because the Secretary's restriction on the number and location of drop boxes is not *required* by law. However, this argument ignores that the Secretary's restriction is also not prohibited by law. We agree with appellees that nothing in R.C. 3509.05 or any other law compelled him to issue the restriction on the number and location of drop boxes, but it does not follow that the Secretary was prohibited from restricting the location of drop boxes.

{¶ 42} Appellees urge us to conclude that because the Secretary's interpretation of R.C. 3509.05(A) was unreasonable, that unreasonable interpretation must render the subsequent directive unlawful. However, appellees point to no authority that a court may grant injunctive relief on the grounds that the Secretary's policy determination was unreasonable.[1]

{¶ 43} Appellees and the amici curiae through their briefs advance strong arguments about the importance of the right to vote, access to elections, and concerns with delays in the U.S. Postal Service that may operate to hinder the timely return of absentee ballots by mail. All of these are important policy considerations in any election year and are certainly highlighted by the November 2020 election occurring during the ongoing pandemic. It is inescapable, however, that these passionate arguments speak to the *reasonableness* of the Secretary's directive. Simply put, there is no authority for a court to grant an injunction against the enforcement of a directive issued pursuant to the authority the General Assembly bestowed upon the Secretary of State by R.C. 3501.05(B) on the grounds that the plaintiff disagrees with the policy position behind the directive.[2] An

---

[1] The separate opinion dissenting from our resolution of the assignments of error related to the preliminary injunction relies on *Perkins v. Quaker City*, 165 Ohio St. 120 (1956) for the proposition that a court's decision to grant an injunction can depend on many factors, including a consideration of public policy. However, the discussion of public policy in *Perkins*, when read in context, relates to the public policy considerations behind granting or denying the injunction, not the public policy of, in that case, the ordinance the plaintiff sought to enjoin. The public policy behind whether granting or denying an injunction would cause harm is a separate and distinct question from whether the instrument seeking to be enjoined is in violation of any law. The separate opinion additionally relies on *Perkins* for the proposition that granting injunctive relief does not depend solely on whether defendants have violated some legal right. However, that quote, when read in context, reflects that a court cannot issue an injunction solely because there has been a violation of a legal right; rather, a court must additionally consider the harms that granting or not granting the injunction could cause. *Perkins* does not hold, as the separate opinion indicates, that an injunction can still lie where a defendant has not violated some legal right.

[2] We are mindful that in the days leading up to issuance of this decision, this court also released its decision in *Ohio Democratic Party v. LaRose*, 10th Dist. No. 20AP-421, 2020-Ohio-4664, considering a challenge to a Secretary of State directive seeking injunctive relief. That decision does not alter our conclusion in this

injunction will not lie unless the directive is clearly against the law.[3]  As we have outlined above, the directive does not violate the law.

{¶ 44} The instruction on the location of drop boxes contained in Directive 2020-16 is not inconsistent with R.C. 3509.05(A), even if not required by the statute.  The trial court ignored this problem and instead granted the injunction on the grounds that the policy behind the directive was unreasonable.  Thus, because the Secretary of State's directive was not issued in violation of any law, appellees are unable to demonstrate a substantial likelihood of success on their claim for a permanent injunction enjoining enforcement of the directive.  Further, because appellees cannot demonstrate a substantial likelihood of success on their claim, denying the preliminary injunction will not cause appellees irreparable injury but granting the preliminary injunction would cause unjustifiable harm to third parties.  And since the directive does not violate the law, it cannot be said that the preliminary injunction would serve the public interest.  We conclude, therefore, that the trial court abused its discretion in granting a preliminary injunction enjoining the enforcement of the directive.  Similarly, to the extent the trial court purported to declare, by declaratory judgment, that the Secretary of State's directive was unlawful, the trial court abused its discretion as appellees' request for declaratory judgment was limited to the meaning of the statute.

{¶ 45} Although the trial court abused its discretion in granting the preliminary injunction enjoining enforcement of Directive 2020-16, we note that to the extent the Secretary wants to allow more drop boxes, R.C. 3509.05(A) would allow it.  Accordingly, we sustain the Secretary of State's second assignment of error and ORP's third and fourth assignments of error.

---

case, as the majority opinion's use of the reasonableness standard in that case applied to the Secretary of State's reasonableness of the construction of the statutory scheme as opposed to a review of whether the underlying policy was reasonable.

[3] We note there are other avenues of relief available to a party seeking to challenge a directive of the Secretary of State on grounds other than a statutory violation, among them a challenge to the directive's constitutionality, as is the subject of the federal case currently pending in the Northern District of Ohio, or an action seeking a writ of mandamus arguing the Secretary abused his or her discretion in issuing a directive.  *See A. Philip Randolph Institute of Ohio v. LaRose*, N.D.Ohio No. 1:20-CV-01908, 2020 U.S. Dist. LEXIS 168667 (Sept. 15, 2020) (pending federal case asserting constitutional challenge to Directive 2020-16); *State ex rel. Skaggs v. Brunner*, 120 Ohio St.3d 506, 2008-Ohio-6333, ¶ 1 (granting requested writ of mandamus on the grounds that the secretary of state's directive was unreasonable).

## VI. Disposition

{¶ 46} Based on the foregoing reasons, we agree with the trial court that the Secretary of State's interpretation of R.C. 3509.05 is not reasonable and that the statute neither prescribes nor prohibits ballot drop boxes at locations other than the boards of elections. However, the trial court abused its discretion in granting a preliminary injunction against enforcement of the directive as the directive does not violate R.C. 3509.05. Thus, we find that while the Secretary was not statutorily required to limit the location of drop boxes, as he did in Directive 2020-16, he was also not statutorily required to allow for additional drop boxes. If the Secretary wants to permit additional drop boxes as allowed by statute, he has the authority to do so, and nothing in this decision prohibits him from rescinding Directive 2020-16 and issuing a new directive. Having overruled the Secretary of State's first assignment of error and ORP's first and second assignments of error, but having sustained the Secretary of State's second assignment of error and ORP's third and fourth assignments of error, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed in part and reversed in part.*

BROWN, J., concurs in part and dissents in part.
DORRIAN, J., concurs in part and dissents in part.

BROWN, J., concurring in part and dissenting in part.

{¶ 47} I concur in part and respectfully dissent in part from the lead opinion. I concur with the lead opinion that ODP has standing, that the trial court did not abuse its discretion in finding a justiciable issue for declaratory judgment, and that the trial court abused its discretion in granting appellees a preliminary injunction. However, being unable to agree with the lead opinion's conclusion that the Secretary's interpretation of R.C. 3509.05 was unreasonable, I dissent.

{¶ 48} R.C. 3509.05(A) provides that, after an elector has received and completed their absentee ballot, the elector "shall mail the identification envelope to the director from whom it was received in the return envelope," or the elector "may personally deliver it to the director" or certain close relatives of the elector "may deliver it to the director." I concur with the lead opinion that R.C. 3509.04 and 3509.05(A) do not indicate that an elector

should personally deliver their absentee ballot to the pre-printed post office address contained on the return envelope. (Lead Opinion at ¶ 27-28.)

{¶ 49} As the lead opinion recognizes, the parties agree that the statute is silent as to whether "deliver" in R.C. 3509.05(A) means returning the ballot to the board of elections or some other location. (Lead Opinion at ¶ 25.) Accordingly, the plain language of R.C. 3509.05(A) presents doubt or ambiguity as to where an elector must go to physically deliver their absentee ballot to the director. *See Family Med. Found., Inc. v. Bright*, 96 Ohio St.3d 183, 2002-Ohio-4034, ¶ 8 (stating that "a statute is ambiguous when its language is subject to more than one reasonable interpretation").

{¶ 50} "The *in pari materia* rule of construction may be used in interpreting statutes where some doubt or ambiguity exists." *State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 585 (1995), citing *State Farm Mut. Auto. Ins. Co. v. Webb*, 54 Ohio St.3d 61, 63-64 (1990). "Statutes and regulations that relate to the same general subject matter may be read in pari materia in order to discover and carry out legislative intent." *Sheet Metal Workers' Internatl. Assn. v. Gene's Refrigeration, Heating & Air Conditioning, Inc.*, 122 Ohio St.3d 248, 2009-Ohio-2747, ¶ 38. In construing statutes in pari materia, a court "must give them a reasonable construction so as to give proper force and effect to each and all of the statutes." *Klopfleisch* at 585, citing *United Telephone Co. v. Limbach*, 71 Ohio St.3d 369, 372 (1994). *See Santarelli v. Western Reserve Transit Auth.*, 7th Dist. No. 88 C.A. 57 (Feb. 10, 1989), quoting 85 Ohio Jurisprudence 3d, Statutes, Section 225, 228 (noting that " '[t]he rule of in pari materia is a reflection of the fact that the General Assembly, in enacting a statute, is assumed, or presumed, to have legislated with full knowledge and in the light of all statutory provisions concerning the subject matter of the act' "). The standard of review for questions of statutory interpretation is de novo. *Turner v. Certainteed Corp.*, 155 Ohio St.3d 149, 2018-Ohio-3869, ¶ 11.

{¶ 51} R.C. 3509.05(A) provides that the "return envelope shall be transmitted to the director in no other manner, except as provided in section 3509.08 of the Revised Code." R.C. 3509.08 pertains to absentee ballots requested by qualified electors who, "on account of the elector's own personal illness, physical disability, or infirmity, or on account of the elector's confinement in a jail or workhouse" will be "unable to travel from the

elector's home or place of confinement to the voting booth in the elector's precinct" on election day. R.C. 3509.08(A). The electors identified in R.C. 3509.08 may request an absentee ballot, and an absentee ballot "may be mailed directly to the applicant." R.C. 3509.08(A). However, if the applicant is confined in a public or private institution within the county, "the board shall designate two board employees * * * for the purpose of delivering the ballot to the disabled or confined elector and returning it to the board." R.C. 3509.08(A). "In all other instances, the ballot shall be returned to the office of the board in the manner prescribed in section 3509.05 of the Revised Code." R.C. 3509.08(A). Construing R.C. 3509.05(A) and 3509.08(A) in pari materia, the statutes indicate that when an elector or an elector's close relative deliver an absentee ballot "to the director," they do so by returning the ballot to the "office of the board." R.C. 3509.05(A); 3509.08(A).

{¶ 52} Furthermore, in H.B. No. 197 the General Assembly instructed boards of elections to place "a secure receptacle outside the office of the board for the return of ballots" for the 2020 primary election.  H.B. No. 197, Section 32(E)(1).  The General Assembly stated that absentee ballots cast for the 2020 primary would be "eligible to be counted if they [were] received at the office of the appropriate board of elections" prior to a specified date, or if "[b]allots received by mail at the office of the board" were postmarked before a specified date.  H.B. No. 197, Section 32(E)(1) and (2).

{¶ 53} Although Section 32(E) was an uncodified statute which applied only to the 2020 primary election, Section 32(E) demonstrates that the General Assembly expected electors to return their 2020 primary absentee ballots by either physically returning those ballots to the office of the board or mailing them. We presume the General Assembly enacted Section 32 of H.B. No. 197 with full knowledge and in light of the two absentee ballot return methods provided for in R.C. 3509.05(A). Accordingly, construing R.C. 3509.05(A) and Section 32(E) of H.B. No. 197 in pari materia indicates the General Assembly's understanding that an elector would deliver their absentee ballot to the director at the office of the board of elections. *Compare Aratari v. Dept. of Rehab. & Correction*, 48 Ohio App.2d 239, 243 (10th Dist.1976) (construing "R.C. 2743.16(A), of the Court of Claims Act, *in pari materia* with the uncodified section 3 of such Act" to ascertain the meaning of the uncodified section).

{¶ 54} The lead opinion concludes that the Secretary's interpretation of R.C. 3509.05(A) was unreasonable, as R.C. 3509.05(A) neither expressly prescribes nor prohibits ballot drop boxes at locations other than the offices of the boards of elections. (Lead Opinion at ¶ 1, 31.) However, construing R.C. 3509.05(A) in pari materia with R.C. 3509.08(A) and H.B. No. 197 demonstrates that the Secretary's interpretation of R.C. 3509.05(A), as requiring that delivery to the director occur solely at the office of the board of elections, was reasonable. Even if R.C. 3509.05(A) is subject to other equally reasonable interpretations, the Secretary's reasonable interpretation of the statute is entitled to deference. *State ex rel. Barth v. Hamilton Cty. Bd. of Elections*, 65 Ohio St.3d 219, 225 (1992) (holding that "[w]hen an election statute is subject to two different, but equally reasonable, interpretations, the interpretation of the Secretary of State, the state's chief election officer, is entitled to more weight"); *State ex rel. Colvin v. Brunner*, 120 Ohio St.3d 110, 2008-Ohio-5041, ¶ 57. Accordingly, I would defer to the Secretary's reasonable interpretation of R.C. 3509.05(A). As Directive 2020-16 reflects the Secretary's reasonable interpretation of R.C. 3509.05(A) and was issued pursuant to the Secretary's authority in R.C. 3501.05(B) and (C), Directive 2020-16 is reasonable and should not be disturbed.

{¶ 55} For these reasons, I would sustain the Secretary's first assignment of error and ORP's second assignment of error, and reverse the trial court's declaratory judgment.

DORRIAN, J., concurring in part and dissenting in part.

{¶ 56} For the following reasons, I concur in part and dissent in part.

{¶ 57} I concur with the lead opinion finding Secretary LaRose's interpretation of R.C. 3509.05 to be unreasonable. I concur with the lead opinion in overruling the Secretary's first assignment of error and ORP's first and second assignments of error, and affirming the trial court's September 15, 2020 declaratory judgment opinion. However, I respectfully dissent from the lead opinion in sustaining the Secretary's second assignment of error and ORP's third and fourth assignments of error, and reversing the trial court's September 16, 2020 entry granting a preliminary injunction to enjoin enforcement of the instruction in Directive 2020-16 erroneously based on the unreasonable interpretation of R.C. 3509.05.

## A. Availability of Injunctive Relief

{¶ 58} Here, we have found the Secretary's interpretation of R.C. 3509.05(A) to be unreasonable and, therefore, not entitled to deference. We further find that R.C. 3509.05(A) does not limit the number or locations of drop boxes that a board may provide, nor does it limit the Secretary from instructing boards of elections that they may have multiple drop boxes at alternate locations in their respective counties. Nevertheless, the lead opinion concludes that Directive 2020-16, which applies the Secretary's unreasonable interpretation of R.C. 3509.05(A) to the boards of elections by prohibiting them from installing a drop box at any location other than the boards of elections, cannot be enjoined in this action. I disagree.

{¶ 59} First, it is important to note that had the Secretary, upon receiving notification of the trial court's declaratory judgment, agreed to rescind Directive 2020-16, injunctive relief would not be necessary in this case. *See Ohio Hosp. Assn. v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 06AP-471, 2007-Ohio-1499, ¶ 26. Indeed, the record reflects the Secretary's statement that he would allow the boards of elections to install secure drop boxes in additional locations if a judicial order made it clear that such action was permissible under Ohio law.[4] Nevertheless, despite the trial court's finding that the Secretary's interpretation of R.C. 3509.05 to limit additional drop boxes was unreasonable and the Secretary's acknowledgment that he had "publicly stated he supports additional drop boxes *if they are legal*," the Secretary did not rescind Directive 2020-16. (Emphasis sic.) (Sept. 16, 2020 Secretary's Response to Show Cause Order at 2.) Instead, the Secretary continued to enforce Directive 2020-16, issuing a message to the boards of elections that "Directive 2020-16 remains in effect," thereby preventing the boards of elections from adding additional drop boxes at other locations. (Sept. 16, 2020 Secretary's Response to Show Cause Order at 3.) *See State ex rel. Hodges v. Taft*, 64 Ohio St.3d 1, 8 (1992). The Secretary then requested the trial court rule on the preliminary injunction motion in order to seek immediate appeal.

---

[4] *See* affidavits of Andre Washington, President of the A. Philip Randolph Institute of Ohio (Aug. 25, 2020 Mot. for Temporary Restraining Order, Ex. E at 1-2.), and Paula Hicks Hudson, State Representative for Ohio's 44th House District (Ex. G at 1.).

{¶ 60} Second, it is also important to note that the lead opinion's analysis and holding is unnecessary. The Secretary's sole justification for instructing the boards of elections was his unreasonable interpretation of R.C. 3509.05(A). In his merit brief, he defines the first issue as "[d]id the Secretary's Directive unreasonably interpret the Ballot Delivery Law?" (Secretary's Merit Brief at vi.)[5] He reasons that "[t]his case begins and ends with the text of the Ballot Delivery Law." (Secretary's Merit Brief at 9.) He further states that the answer in this case "turns on the statutory text, not the wisdom of the policy choices that motivated [the] passage [of the statutory text]." (Secretary's Merit Brief at 17.) Because the sole justification is the unreasonable interpretation of the statute, the preliminary injunction must issue as the Secretary offered no other justifications to consider. Accordingly, it is not necessary to consider whether a preliminary injunction can issue for the unreasonableness of the Secretary's exercise of discretion based on any other justification.

{¶ 61} In support of reversing the preliminary injunction, the lead opinion points to the fact that appellees did not argue and establish Directive 2020-16 resulted in a constitutional or statutory violation. However, given the two considerations I note above, this was not necessary. Considering the Secretary's prior public statements that he would comply with a court order declaring he had the authority to allow additional drop boxes, it is unclear *why* appellees would have sought to make such claims in addition to their request for a declaratory judgment and relief in the form of an injunction enjoining enforcement of the prohibition in Directive 2020-16 on boards of elections installing additional drop boxes. Regardless, appellees' decision to not make such claims has no bearing on the matter before us, as the availability of equitable relief in the form of an injunction does not turn on the demonstration of a constitutional or statutory violation.

{¶ 62} Third, the lead opinion sets new precedent without any authority or support. In determining whether the trial court abused its discretion by granting the motion for

---

[5] The Secretary defines the third issue as "Even if the Ballot Delivery Law permits the installation of multiple dropboxes, can Directive 2020-16 be upheld as a permissible exercise of the Secretary's authority to provide election guidance through directives?" (Secretary's Merit Brief at vii.) Yet—in the discussion of this issue, the Secretary addresses no other justifications for issuance of the instruction in Directive 2020-16 except his unreasonable statutory interpretation.

preliminary injunction, the lead opinion states the trial court erroneously determined the first injunction factor, i.e. likelihood of success on the merits, to be satisfied. The lead opinion instead states the "focus" for determining whether injunctive relief is appropriate is "whether appellees have demonstrated that Directive 2020-16 is in violation of the law." (Lead Opinion at ¶ 37.) However, a court's power to issue injunctive relief is not circumscribed to only such cases.

{¶ 63} Rather, " '[a]n injunction is an extraordinary remedy in equity where there is no adequate remedy available at law. It is not available as a right but may be granted by a court if it is necessary to prevent a future wrong that the law cannot.' " *Toledo v. State*, 154 Ohio St.3d 41, 2018-Ohio-2358, ¶ 15, quoting *Garono v. State*, 37 Ohio St.3d 171, 173 (1988). The question of whether to grant an injunction "depends largely on the character of the case, the peculiar facts involved and other pertinent factors, among which are those relating to public policy and convenience." *Perkins v. Quaker City*, 165 Ohio St. 120, 125 (1956). *See Cementech, Inc. v. Fairlawn*, 109 Ohio St.3d 475, 2006-Ohio-2991, ¶ 10. Furthermore, the granting of injunctive relief "depends not upon the strict right of the parties to some redress, *nor upon the question whether the defendants have violated some legal right*, but it depends upon whether, under the circumstances, this extraordinary process should go in the particular instance." (Emphasis added.) *Perkins* at 125.

{¶ 64} The Supreme Court of Ohio has recognized that "[i]f the secretary's 'advice [to the boards of elections] is an erroneous interpretation of the election laws there must be some remedy to correct the error and to require proper instructions in lieu of those erroneously given.' " *State ex rel. Colvin v. Brunner*, 120 Ohio St.3d 110, 2008-Ohio-5041, ¶ 20, quoting S*tate ex rel. Melvin v. Sweeney*, 154 Ohio St. 223, 226 (1950). There is precedent for mandamus being one avenue for relief when challenging the reasonableness of a directive. However, case law makes clear that it is not the only method. *See Colvin* at ¶ 20; *Hodges* at 8; *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141, 150 (1967) (stating that "where a petition which is labeled an 'action in mandamus' but its allegations, in effect, seek an injunctive remedy to restrain and enjoin the respondents rather than to compel respondents to perform a clear legal duty, *such a petition does not state a cause of action in mandamus* but states a cause of action in injunction"). (Emphasis sic.) In *Colvin*, the court noted that "if the secretary of state 'has, under the law, misdirected the members

of the boards of elections as to their duties, the matter *may* be corrected through the remedy of mandamus.' " (Emphasis added.)   *Colvin* at ¶ 20, quoting *Melvin* at 226.

{¶ 65} Against this backdrop, it is important to consider that both ORP and the Secretary have asserted that appellees were required to bring a mandamus action in order to obtain the relief they sought.   However, both ORP and the Secretary also argued that appellees could not succeed in a mandamus action.   Specifically, ORP and the Secretary argued that appellees lacked standing to bring a claim in mandamus because they could not establish the Secretary was under a clear legal duty, as required in mandamus, to allow boards to install drop boxes different in number or location than provided under Directive 2020-16 because R.C. 3509.05 was silent on the matter.   *See State ex rel. Linnabary v. Husted*, 138 Ohio St.3d 535, 2014-Ohio-1417, ¶ 13 (stating that to prevail in mandamus, a party "must establish a clear legal right to the requested relief, a clear legal duty [for the respondent] to provide it, and the lack of an adequate remedy in the ordinary course of the law"); *Hodges* at 8.

{¶ 66}  In *Hodges*, the Supreme Court found a directive issued by the Secretary to be contrary to Ohio election law.   However, the court recognized that the relators could not succeed in establishing a right to the issuance of a writ of mandamus because, although the Secretary "is required to advise the boards [of elections], the content of his advice [in the issued directive] is discretionary."  *Hodges* at 8.  Furthermore, even though the Secretary's directive was contrary to law, the court found it would be "unrealistic to contend that the boards of elections could ignore the secretary's advice," but rather found that "there is authority that the boards were required to follow it."  *Id.* at 8.  Despite finding the relators had no remedy in mandamus due to the lack of clear legal duty, the court stated that the relators could seek relief "in an action for declaratory judgment pursuant to R.C. Chapter 2721."  *Id.*  The court opined that "the prohibitive relief requested by relators is more suited to declaratory judgment or injunction than to mandamus, which is a command to perform an affirmative act."  *Id.*, citing *Pressley* at 150 (stating that "where a petition which is labeled an 'action in mandamus' but its allegations, in effect, seek an injunctive remedy to restrain and enjoin the respondents rather than to compel respondents to perform a clear legal duty, *such a petition does not state a cause of action in mandamus* but states a cause of action in injunction").  (Emphasis sic.)

{¶ 67} Thus, *Colvin* makes clear there must be a remedy when the Secretary issues a directive based on an unreasonable interpretation of the law. Furthermore, *Colvin* stands for the proposition that such relief "*may* be corrected through the remedy of mandamus," but does not provide that mandamus is the only avenue of relief. (Emphasis added.) *Id.* at ¶ 20. Consistent with this reasoning in *Colvin*, *Hodges* specifically allows that relief in such a case might more properly be found in an action for a declaratory judgment or injunction. *Compare Ohio Democratic Party v. LaRose*, 10th Dist. No. 20AP-421, 2020-Ohio-4664, ¶ 31.

{¶ 68} Thus, as R.C. 3509.05 is silent on the question at hand, namely the ability of the boards of elections to add additional drop boxes at locations other than their offices, it is arguable as to whether the Secretary had a clear duty to act. We need not resolve the question of whether an action in mandamus would lie in this instance, however, since a remedy in the form of injunctive relief is available in order to correct the Secretary's unreasonable interpretation of election law.

{¶ 69} Furthermore, the lead opinion suggests that a court review of reasonableness is limited only to review of the construction of a statute. However, in a recent decision involving a different directive issued by the Secretary, this court reviewed a trial court's decision granting a declaratory judgment and preliminary injunction. *LaRose*. In that case, we considered the policy justifications the Secretary advanced for the issuance of his Directive 2020-13. *LaRose* at ¶ 46-53, and (Dorrian, J., concurring) ¶ 88-103. Although the panel was divided on the outcome, the question considered was whether the Secretary "acted unreasonably in exercising his authority to issue a directive." *Id.* at ¶ 49, and (Dorrian, J., concurring) at ¶ 89.[6] Furthermore, we did so even after determining the Secretary's interpretation of the statute at issue was reasonable. How is it possible then to

---

[6] The lead opinion suggests the majority in *LaRose* examined the reasonableness of the Secretary's interpretation of the statutory scheme as opposed to a review of whether the underlying policy is reasonable. In fact, in *LaRose* the court conducted both analyses, and the discussion of whether the Secretary acted reasonably did not commence until after the statutory analysis was complete. The majority in that case determined "the [S]ecretary had authority to issue instructions * * * and, in *exercising that authority*, issued a reasonable instruction limiting return of absentee ballot applications to mail and in-person delivery." (Emphasis added.) *Id.* at ¶ 53.

reconcile that a court cannot look at the reasonableness of exercising discretion when the interpretation of a statute is unreasonable?

{¶ 70} Next, granting a preliminary injunction in this case does not prevent the Secretary from issuing further directives reasonably interpreting gaps in Ohio's election law scheme.[7] *See State ex rel. Peregrine Health Servs. of Columbus, LLC v. Sears,* 10th Dist. No. 18AP-16, 2020-Ohio-3426, ¶ 33, quoting *Northwestern Ohio Bldg. & Constr. Trades Council v. Conrad*, 92 Ohio St.3d 282, 289 (2001) ("[A] legislative gap is not equivalent to a lack of authority for the agency to act. * * * [T]he power of an administrative agency to administer a * * * program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by the legislature.)[8] (Internal quotations omitted.); *LaRose* at ¶ 48. In examining the propriety of declaratory and injunctive relief, our decision, like the trial court's, is limited to examining the reasonableness of the directive based on the record in this case, including any evidence submitted by the Secretary. As noted previously here, the Secretary argued that analysis of the reasonableness of his interpretation "begins and ends with the text of the Ballot Delivery Law, R.C. 3905.05." (Secretary's Merit Brief at 9.) Rather than advancing other factors in support of the reasonableness of his interpretation, the Secretary argued that "R.C. 3509.05 cannot be interpreted to grant boards [of elections]" the authority "to accept absentee ballots at multiple locations." (Sept. 8, 2020 Mot. to Dismiss at 25.)

{¶ 71} If under his authority to "[i]ssue instructions by directives * * * to members of the boards [of elections] as to the proper methods of conducting elections" the Secretary chooses to issue a subsequent directive limiting the number or location of drop boxes, and

---

[7] It is significant to note that the parties in this case stipulated to the following: " '[plaintiffs] do not claim a legal right to a certain number or location of drop boxes in this case[, and do not] seek to require any county board of elections to provide additional drop boxes in this case.' " (Sept. 15, 2020 Opinion at 13, quoting Joint Stip. at 11-13.)

[8] In a different context of "filling the gap," rules adopted pursuant to R.C. 119 cannot be unreasonable *or* unlawful. R.C. 119.03(D); *Sterling Drug, Inc. v. Wickham*, 63 Ohio St.2d 16 (1980). Accordingly, review of such a rule is not confined to considering whether the rule is unlawful. Courts may also consider whether a rule is unreasonable. Although the Secretary's authority to issue instructions by directives and advisories pursuant to R.C. 3501.05(B) is not subject to R.C. 119, in the absence of any authority indicating otherwise for directives and instructions issued by the Secretary pursuant to R.C. 3501.05(B) and (C), by analogy they too should not be unreasonable or unlawful. If reasonableness of the exercise of authority is challenged courts should also be permitted to consider the same.

if a challenge to such directive is brought, the court could then examine the reasonableness of the Secretary's exercising of discretion with the issuance of such directive or the process undertaken for its issuance. R.C. 3501.05(B). Other arguments the Secretary might assert in support of the reasonableness of such a directive are not presently before us in this case. Therefore, we need not issue an advisory opinion or speculate further on the same at this time. *See Devine-Riley v. Clellan*, 10th Dist. No. 11AP-112, 2011-Ohio-4367, ¶ 3 ("Appellate courts are not required to render an advisory opinion on a moot question or to rule on a question of law that cannot affect matters at issue in a case."); *Harper v. Lefkowitz*, 10th Dist. No. 09AP-1090, 2010-Ohio-6527, ¶ 35 (declining to provide an opinion on an issue not affecting the case because of this court's reluctance to issuing advisory opinions).

{¶ 72} The Secretary is owed deference regarding his policy determinations, and indeed it is a high bar to meet for a court to determine the exercise of discretion pursuant to R.C. 3501.05(B) and (C) is unreasonable. *Cementech* at ¶ 10, quoting *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.*, 73 Ohio St.3d 590, 604 (1995), quoting *Leaseway Distrib. Ctrs, Inc. v. Dept. of Adm. Servs.*, 49 Ohio App.3d 99, 106 (10th Dist.1988) (stating that "the granting of an injunction should be done with caution, ' "especially in cases affecting a public interest where the court is asked to interfere with or suspend the operation of important works or control the action of another department of government" ' "). However, I respectfully cannot agree with the lead opinion where it sets two unnecessary, unsupported and unsettling precedents that (1) injunctions cannot issue against the Secretary unless there is a statutory or constitutional violation, and (2) reasonableness of the Secretary's exercise of discretion pursuant to R.C. 3501.05(B) and (C) cannot be remedied by way of injunctive relief.[9] Neither of these precedents should stand. A Secretary of state, whether Republican, Democrat, otherwise affiliated or unaffiliated, cannot have unfettered discretion. This is especially pertinent given that the Secretary possesses broad authority pursuant to R.C. 3501.05(B) and (C) as well as authority, pursuant to R.C. 3501.053(A), to issue temporary directives, which are not

---

[9] By implication, the lead opinion seems to suggest exercise of discretion can only be challenged by way of mandamus, the granting of which requires a showing of a clear legal right and a clear legal duty to the requested relief.

subject to public review and public comment requirements, in the 90 days prior to the day of the election. This was the case with the issuance of Directive 2020-16.

{¶ 73} Finally, I end where I began, I agree with the lead opinion that the Secretary is entitled to deference on a reasonable interpretation of election law. However, where the Secretary's interpretation is the sole justification for the instruction and the interpretation is unreasonable and therefore not entitled to deference, it cannot be the case that the Secretary can continue through the exercise of his discretion to misdirect the boards of elections. Based on the foregoing, I would consider the factors for the issuance of injunctive relief.

## B. Preliminary Injunction Elements

{¶ 74} A party requesting a preliminary injunction must show that: (1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) the plaintiff will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction. *Garb-Ko, Inc. v. Benderson*, 10th Dist. No. 12AP-430, 2013-Ohio-1249, ¶ 32. A party seeking a preliminary injunction bears the burden of establishing a right to the preliminary injunction by demonstrating clear and convincing evidence of each of these factors. *Youngstown City School Dist. Bd. of Edn. v. State*, 10th Dist. No. 15AP-941, 2017-Ohio-555, ¶ 50. However, "[i]n determining whether to grant injunctive relief, no one of the four preliminary injunction factors is dispositive; rather, a balancing should be applied." *Id.* "A court should exercise great caution regarding the granting of an injunction which would interfere with another branch of government * * * and we have recognized that a court cannot employ equitable principles to circumvent valid legislative enactments." (Internal quotations and citations omitted.) *Toledo*, 2018-Ohio-2358, at ¶ 16.

{¶ 75} The decision to grant or deny an injunction is within the discretion of the trial court and generally will not be reversed absent an abuse of discretion. *Garb-Ko* at ¶ 32. An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 76} The trial court in this case determined appellees established a substantial likelihood of success on the merits, that they would be irreparably injured absent an injunction, that there is no evidence of harm to other parties, and that the public interest

will be served by the issuance of an injunction.  (Sept. 16, 2020 Entry Granting Preliminary Injunction at 2-3.)  I would find that, in so doing, the trial court did not abuse its discretion.

### 1.  First Element: Substantial Likelihood of Success on the Merits

{¶ 77}  There is no need to further discuss the first element of substantial likelihood of success on the merits as we have concluded appellees are entitled to declaratory relief. As a result, and for the reasons outlined in the lead opinion regarding the same, this factor weighs in favor of granting injunctive relief.  *LaRose* at ¶ 34.  *See generally State v. Cincinnati Citizen Complaint Auth.*, 1st Dist. No. C-180509, 2019-Ohio-5349, ¶ 22 (analyzing success on the merits factor in the context of a declaratory judgment claim).  I would find the trial court did not err or abuse its discretion in determining appellees established a substantial likelihood of success on the merits.

### 2.  Second and Fourth Elements: Irreparable Injury and Public Interest

#### a. Unusual Background Factors – COVID-19 and Delay of U.S. Mail Delivery

{¶ 78}  When considering the second and fourth elements of preliminary injunction, it is important to note the trial court's discussion in the opinion granting declaratory judgment of the unusual background factors of the COVID-19 pandemic and delay of U.S. mail delivery.  (Sept. 15, 2020 Opinion at 3-6.)  Indeed, these factors weigh heavily in consideration of whether appellees established the elements of irreparable injury if the injunction is not granted and the public interest will be served by the granting of an injunction.

##### i. COVID-19 Pandemic

{¶ 79}  On March 9, 2020, the Governor of Ohio declared a state of emergency to protect the well-being of Ohioans from the effects of COVID-19.  Office of Governor Mike DeWine, *Executive Order 2020-01D* (Mar. 9, 2020).  Executive Order 2020-01D noted that COVID-19 "is a respiratory disease that can result in serious illness or death * * * and can easily spread from person to person" and that the virus causing COVID-19 "is spread between individuals who are in close contact with each other (within about six feet) through respiratory droplets produced when an infected person coughs or sneezes."  Executive Order 2020-01(D) indicated that as of March 9, 2020, the Ohio Department of Health ("Ohio Dept. of Health") confirmed that three patients in Ohio had tested positive for

COVID-19, and there were no reported deaths.[10] Later that same week, the Director of Ohio Dept. of Health ("the Director") issued orders closing all K-12 schools in the state and limiting or prohibiting mass gatherings. Ohio Dept. of Health, *Director's Order In Re: Order the Closure of All K-12 Schools in the State of Ohio* (Mar. 14, 2020); Ohio Dept. of Health, *Director's Order In Re: Order to Limit and/or Prohibit Mass Gatherings in the State of Ohio* (Mar. 12, 2020).

{¶ 80} On March 16, 2020, the Director issued an order closing polling locations for the primary election to be held the following day "to avoid the imminent threat with a high probability of widespread exposure to COVID-19 with a significant risk of substantial harm to a large number of the people in the general population, including the elderly and people with weakened immune systems and chronic medical conditions." Ohio Dept. of Health, *Director's Order In Re: Closure of the Polling Locations in the State of Ohio on Tuesday March 17, 2020* (Mar. 16, 2020). The Director further concluded that "[t]o conduct an election at this time would force poll workers and voters to face an unacceptable risk of contracting COVID-19." *Id.* The same day, the Secretary issued a directive suspending the March 17, 2020 primary election until June 2, 2020. Secy. of State, *Directive 2020-06* (Mar. 16, 2020). The General Assembly subsequently enacted legislation voiding the Secretary's directive and providing that any elector who had not previously cast a ballot in the March 17, 2020 primary election could request and cast an absentee ballot by April 28, 2020. Am.Sub.H.B. No. 197, Sec. 32(A), (C)(1)(a). This legislation became effective on March 27, 2020. Pursuant to Am.Sub.H.B. No. 197, with limited, specific exceptions, the primary election was conducted exclusively by absentee ballot.

{¶ 81} The statewide state of emergency declared by Executive Order 2020-01(D) remains in effect, as COVID-19 remains a threat to public health. Although limited reopening has been authorized under the Responsible RestartOhio Plan, Governor DeWine stated "[w]e put this plan together based on all the information we have about how dangerous COVID-19 still is right now, balanced with the fact that it's also dangerous to

---

[10] Subsequent data compiled by Ohio Dept. of Health indicates that as of March 9, 2020, there were 539 cases of COVID-19 in Ohio, 17 hospitalizations, and 1 death. Ohio Dept. of Health, *State of Ohio COVID-19 Dashboard*, https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards (accessed Oct. 1, 2020). The Dashboard indicates "All data displayed is preliminary and subject to change as more information is reported to ODH."

have people not working.  COVID-19 is still out there.  It's still killing people.  We're asking Ohioans to be reasonable and rational."  Gov. of Ohio, *Press Release: Governor DeWine Announces Details of Ohio's Responsible RestartOhio Plan* (Apr. 27, 2020), https://governor.ohio.gov/wps/portal/gov/governor/media/news-and-media/covid19-update-april-27 (accessed Oct. 1, 2020).  Ohio Dept. of Health data indicates that when the Secretary issued his directive suspending the March 17, 2020 primary election, there had been 1,593 confirmed and probable cases of COVID-19 in Ohio, 86 hospitalizations, and 1 death.  As of August 12, 2020, when the Secretary issued Directive 2020-16, there had been 111,142 cases of COVID-19 in Ohio, 11,473 hospitalizations, and 3,948 deaths.  By the time oral argument in this expedited appeal was held on September 25, 2020, there had been 152,610 total reported cases of COVID-19 in Ohio, 13,913 hospitalizations, and 4,777 deaths.[11] [12]

{¶ 82} The parties have stipulated that election officials are expecting a major increase in mail-in voting this year due to COVID-19.  (Joint Stip. at 6.)  The Secretary stipulated that there were 1,206,416 total absentee ballots in the 2016 general election in Ohio. (Joint Stip. at 1.)  This year, Ohio has already mailed approximately 7.8 million absentee ballot applications in conjunction with the 2020 general election. The Secretary has stated the percentage of Ohioans who vote by mail could increase from 20 percent to 50 percent this year.  (Joint Stip. at 7.)  In a September 29, 2020 press release posted on the Secretary's website, he announced more than 2 million Ohioans have requested an

---

[11] COVID-19 case, hospitalization, and death data taken from the Ohio Dept. of Health COVID-19 Dashboard, available at https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards (accessed Oct. 1, 2020). The Dashboard indicates "All data displayed is preliminary and subject to change as more information is reported to ODH."

[12] Additionally, the Ohio Public Health Advisory System categorizes all Ohio counties as one of four levels, depending on whether certain risk indicators have been met. The levels are as follows: Level 1, indicating active exposure and spread of COVID-19; Level 2, indicating increased exposure and spread of COVID-19; Level 3, indicating very high exposure and spread of COVID-19; and Level 4, indicating severe exposure and spread of COVID-19. The guidance for Levels 2, 3, and 4 indicate "[d]ecrease in-person interactions" with others and "[h]igh-risk individuals should take care to follow precautions." Level 3 guidance further provides individuals are advised to "[l]imit activities as much as possible," and Level 4 guidance provides individuals are advised to "[s]tay at home" and "[o]nly leave home for supplies and services." As of September 23, 2020, two days before oral argument in this appeal, of Ohio's 88 counties, no counties were categorized as Level 4, nine counties were categorized as Level 3, and 47 counties were categorized as Level 2. *See* Ohio Dept. of Health, Ohio Public Health Advisory System (accessed Oct. 1, 2020), https://coronavirus.ohio.gov/static/OPHASM/County-Level-Indicator-Breakdown.pdf.

absentee ballot, compared to the same time in 2016 when 957,260 Ohioans had requested an absentee ballot. Ohio Secretary of State, *Secretary LaRose Announces More Than 2 Million Ohioans Have Requested an Absentee Ballot*, https://www.sos.state.oh.us/media-center/press-releases/2020/2020-09-29/ (accessed Oct. 1, 2020).

{¶ 83} Appellee Goldfarb testified that "[w]ith the COVID outbreak, I don't feel comfortable voting in person." (Sept. 11, 2020 Tr. at 8.) Goldfarb stated he had "underlying medical conditions that make me at high risk for COVID." (Sept. 11, 2020 Tr. at 9.) Many members of appellee ODP, as well as intervenor ORP, likely fall into a high-risk category as well.[13] Goldfarb expressed concern that "[i]f there's only one drop box," there would be "long lines" of voters waiting to drop off their completed ballots. (Sept. 11, 2020 Tr. at 18.) Goldfarb stated that "I don't want to wait in line to drop my ballot in the drop box. With my high-risk health conditions, I do not want to wait in line with other people." (Sept. 11, 2020 Tr. at 19.) Goldfarb testified that "safety concerns" as well as "inconvenience" prevented him from driving to the Franklin County Board of Elections to utilize their drop box. (Sept. 11, 2020 Tr. at 19.)

ii. Delay of U.S. Mail Delivery

{¶ 84} During the period when the 2020 primary election was being conducted exclusively by absentee ballot pursuant to Am.Sub.H.B. No. 197 (i.e., late-March 2020 through late-April 2020), the Secretary became aware that delays in delivery of mail by the U.S. Postal Service created a risk that a voter who requested an absentee ballot might not receive that ballot in time to receive it and return their voted ballot by election day and have it counted. *LaRose* at ¶ 95 (Dorrian, J., concurring). Appellant expressed concern about postal delays affecting voting in a letter to Ohio's congressional delegation. In the letter, he indicated that the postal delays "mean it is very possible that many Ohioans who have requested a ballot [for the primary election] may not receive it in time." *Id.* at ¶ 95. Those concerns ultimately proved to be well-founded; after the primary election, it was reported that more than 300 ballots that were postmarked on or before April 27, 2020 were delivered

---

[13] The Ohio Dept. of Health states that "Over 60% of Ohioans are considered high-risk based on CDC guidance. High-risk individuals are at an increased risk of severe illness and should take every precaution to guard against contracting COVID-19." *See* Ohio COVID-19 Risk Level Guidelines for the Public dated July 1, 2020 (accessed October 1, 2020).

to the Butler County Board of Elections on May 12, 2020. Although the ballots would have been eligible to be counted based on the postmark dates, they could not be counted because they were received after the legal deadline for counting votes. *Id.*

{¶ 85} In a July 30, 2020 letter, the general counsel for the United States Postal Service advised the Secretary that there is a significant risk that delays in the delivery of mail may result in otherwise timely ballots not being counted. Specifically, the general counsel informed the Secretary that "certain state-law requirements and deadlines appear to be incompatible with the Postal Service's delivery standards" and "[a]s a result, to the extent that the mail is used to transmit ballots to and from voters, there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not returned in time to be counted." (Aug. 25, 2020 Mot. for Temporary Restraining Order, Ex. C-1 at 2.)

{¶ 86} -Goldfarb testified he wished to use a drop box closest to his residence to vote because "I've been keeping up on what's going on with the post office, and I don't trust that if I mail my ballot, it will get there in time. I see that with all the delays that are going on with the post office, I want to make sure my vote is counted, so I plan to drop it off at a drop box." (Sept. 11, 2020 Tr. at 8-9.) Goldfarb further testified he was "concerned" about whether his completed ballot would be returned to the board of elections on time because "my understanding is I won't receive my ballot until at least October 6th, when they start mailing them out. So there's not a lot of time between October 6th and November 3rd, the date of the election." (Sept. 11, 2020 Tr. at 11.) Goldfarb stated: "I just feel much more comfortable, instead of mailing my ballot with the mail delays, making sure that my vote is delivered by dropping it in a drop box." (Sept. 11, 2020 Tr. at 11.)

b. *Additional Factors - Long Lines, Traffic Backups, and Burdensome Transit Times*

{¶ 87} In addition to discussing the unusual background factors of COVID-19 and delay of U.S. mail delivery, the trial court also discussed evidence presented regarding the experience of two boards of elections which experienced long lines and traffic backups as voters were attempting to access the drop box. The trial court noted that in Hamilton County "the 2020 primary election resulted in serious traffic safety problems due to increased number of voters personally delivering their absentee ballot [and] on the last day

of primary voting lines of vehicles waiting to get to the drop box extended into a nearby four-lane state highway, and were estimated to be as long as a mile in both directions." (Sept. 15, 2020 Opinion at 8.)  (*See also* affidavit of Caleb A. Faux, Member of the Hamilton County Board of Elections, ¶ 13-14.)  The court further noted that in Montgomery County an exterior drop box located on one of Dayton's main east-west thoroughfares led to traffic congestion.  Ultimately, the drop box was moved to the loading dock of a county building, but "[s]till, only a small number of vehicles can wait in line * * * before traffic backs up on to Third Street." (Sept. 15, 2020 Opinion at 9.)[14]

{¶ 88} The trial court also referenced data in the record regarding transit times. Specifically, a spreadsheet attached to the affidavit of Bradley W. Thomas showed the shortest, one-way travel times using public transportation from various public library branches in Hamilton and Franklin County to the board of elections offices in each of those counties.  The spreadsheet also showed the shortest, one-way travel times using public transportation from each of the county library branches to a proposed drop box located downtown in both Franklin and Hamilton counties. Based on this information, the trial court concluded the "potential time savings for some voters would be substantial." (Sept. 15, 2020 Opinion at 8.)  The spreadsheets reveal that, depending upon the location from which a voter begins transit, in some instances the time savings from adding one additional drop box could be  33-58 minutes.  (*See* affidavit of Bradley W. Thomas, former trustee of the Southwest Ohio Regional Transit Authority, and attached spreadsheets, Exs. F, F-1 and F-2.)

c. *Irreparable Injury has been  Established*

{¶ 89}  " 'Irreparable harm' is an injury 'for the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law, and for which restitution in [money] would be impossible, difficult or incomplete.' " *Aids Taskforce of Greater Cleveland v. Ohio Dept. of Health*, 8th Dist. No. 105971, 2018-Ohio-2727, ¶ 52, quoting *Cleveland v. Cleveland Elec. Illum. Co.*, 115 Ohio App.3d 1, 12 (8th Dist.1996); *Obama for*

---

[14] Although this quotation appears in the trial court's opinion, the underlying exhibit, which appears in the list of joint stipulated exhibits, was not transmitted with the record in this appeal.

*Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.2012). "Irreparable harm depends upon the context in each case." *Aids Taskforce of Greater Cleveland* at ¶ 52.

{¶ 90} Within the context of elections, where a plaintiff seeking a preliminary injunction has demonstrated, by clear and convincing evidence, a threat or impairment to their constitutional right to vote, irreparable harm is presumed. *Magda v. Ohio Elections Comm.*, 10th Dist. No. 14AP-929, 2016-Ohio-5043, ¶ 38; *Colvin*, 2008-Ohio-5041, at ¶ 62; *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health*, 124 Ohio App.3d 308, 315 (10th Dist.1997). Conversely, assertions of a threat or impairment to the constitutional right to vote that are vague and speculative do not constitute clear and convincing evidence of irreparable harm to support a preliminary injunction. *Robert W. Clark, M.D., Inc.; League of Women Voters v. LaRose*, S.D.Ohio No. 2:20-cv-1638 (Apr. 3, 2020).

{¶ 91} The Secretary and ORP intervenors argue that plaintiffs will not be irreparably injured as "Ohio is generous when it comes to absentee voting," and "Ohio voters quite simply have more than adequate opportunities to vote without drop boxes located off board premises." (Secretary's Merit Brief at 26; Intervenor ORP's Merit Brief at 30.)

{¶ 92} We have recently stated that the burden on the right to vote in this type of case should be considered " 'within the landscape of all opportunities that Ohio provides to vote.' " *LaRose* at ¶ 59, quoting *Mays v. LaRose*, 951 F.3d 775, 785 (6th Cir.2020). *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (stating the public has a "strong interest in exercising the 'fundamental political right' to vote"). *See Obama for Am.* at 436; *League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 248 (4th Cir.2014). However, courts cannot accurately evaluate all the opportunities Ohio provides to facilitate voting, including absentee voting, without considering the unique circumstances within which those opportunities exist. Courts must consider whether such circumstances increase the magnitude of the injury or compromise the opportunities to vote. The unique circumstances surrounding the 2020 general election that must be considered in evaluating whether appellees will be irreparably harmed are the continuing state of emergency in Ohio due to COVID-19 and the uncertainty of normal postal service operations.

{¶ 93} Clear and convincing evidence in this case reveals that Goldfarb's risk of exposure to or infection by COVID-19 and risk of not having his ballot timely returned by U.S. mail delivery in order to be counted is more than speculative. We need not wait to see if COVID-19 or delay of U.S. mail delivery will compromise opportunities to vote. These circumstances already did compromise opportunities to vote in the 2020 primary election, and the circumstances have not improved since then. Furthermore, Goldfarb may encounter long lines or traffic jams which would impede his access to a single ballot drop box located at the office of a board of elections. Goldberg's injury is real, it is significant. "Irreparable harm is an injury for the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law, and for which restitution in [money] would be impossible." (Internal quotations and citations omitted.) *Aids Taskforce of Greater Cleveland* at ¶ 52. Indeed, in his letter to the deputy postmaster general regarding the 300 ballots not counted in Butler County due to mail delay, the Secretary himself wrote "[o]ur democratic republic is built upon the power of the vote and the trust citizens have that their vote will be counted. For these Ohioans, that trust was violated." *LaRose* at ¶ 95 (Dorrian, J., concurring). I would find the trial court did not abuse its discretion in determining appellees established they would suffer irreparable injury if the injunction is not granted.

d. *Public Interest has been Established*

{¶ 94} The trial court also found that the public interest will be served with the granting of the injunction. The Secretary and intervenor ORP argue the public interest is not served by making changes to election rules close to an election. This argument is not persuasive as applied to this case for two reasons, first, absentee voting has yet to start and when it does start next week on October 6, 2020, it will continue until November 2, 2020 if delivered and postmarked by U.S. mail (and received by November 13, 2020) and until November 3, 2020 if delivered to the boards of election.[15] Second, if appellees pursue the placement of additional drop boxes at additional locations, it would add opportunities for voting, not take them away.

---

[15] https://www.ohiosos.gov/globalassets/publications/election/2020electioncalendar_12x18.pdf

{¶ 95} Furthermore, the public health emergency existing in 2020 makes the unique circumstances surrounding the 2020 general election substantially different than an ordinary election. *See Republican Natl. Commt. v. Democratic Natl. Commt.*, __ U.S. __, 140 S.Ct. 1205, 1210 (2020) (Ginsburg, J., dissenting) ("The Court's suggestion that the current situation is not 'substantially different' from 'an ordinary election' boggles the mind."). The evidence in this case, including the Secretary's own stipulations, indicates that because of those circumstances there will likely be a substantial increase in the number of voters who will seek to vote by absentee ballot. As noted above, the unusual public health conditions in which this election is being conducted are compounded by the disruption in normal postal delivery service. If the procedures for application, delivery, and return of absentee ballots are not adequate to meet the increased demand, voters may be faced with the dilemma of either endangering their own or others' health due to COVID-19 by voting in-person or risking not having their vote counted either because the ballot was not delivered in a timely manner via U.S. mail or access to the ballot drop box was impeded by long lines, traffic jams, or travel times. I would find the trial court did not abuse its discretion in determining appellees established that the public interest will be served by the granting of the injunction.

### 3. Third Element: No Harm to Third Parties

{¶ 96} The trial court found the evidence does not reflect that injunctive relief would result in harm to third parties. The Secretary has argued that injunctive relief would harm Ohio voters and the state by changing election procedures so close to the election. However, as noted above, at the time of this decision, absentee voting has not yet begun in Ohio. Furthermore, when it does begin on October 6, 2020, it will continue until November 2, 2020 if delivered and postmarked by U.S. mail (and received by November 13, 2020) and until November 3, 2020 if delivered to the boards of election. The Secretary has not pointed to evidence in the record to support the assertion that allowing a change in the number and location of drop boxes at this point would result in harm. I note that in multiple affidavits stipulated to by the parties, members of various county boards of elections stated that, in essence, it would be difficult to resolve issues related to the installation of multiple drop boxes prior to the election. However, the issuance of injunctive relief in this case would not require county boards of elections to install multiple drop boxes, but rather would only

permit boards of elections to install additional drop boxes if they determine appropriate exercising their authority pursuant to R.C. 3501.11.[16]

{¶ 97}  Furthermore, the evidence also does not support finding that injunctive relief would harm ORP.   The trial court found that "[v]oters of both major parties (and independent voters) all will benefit from easier and safer access to absentee ballot drop box locations or other measures that individual boards may adopt allowing voters to securely deliver their ballots without using the U.S. Postal Service."  (Sept. 16, 2020 Entry Granting Preliminary Injunction at 2.)  The trial court further stated that ORP would not be harmed by the issuance of injunctive relief because "each board of elections operates only through two members of ORP and two members from ODP, precluding as a practical matter action that gives partisan advantage to either major party." (Sept. 16, 2020 Entry Granting Preliminary Injunction at 2.)

{¶ 98}  Rob Secaur, executive director of ORP, stated in his affidavit that ORP would be harmed by an injunction enjoining application of Directive 2020-16 because ORP would have to "fund and support activities designed to provide Ohio voters with information about drop boxes that are not located on county board of elections." (Rob Secaur Affidavit at 3.) However, the Secretary stipulated that "historically, there is no significant difference between Republican and Democratic voters when it comes to voting by mail in Ohio." (Joint Stip. at 8.)  Furthermore, the parties stipulated that "[b]oth major parties in Ohio heavily organize around encouraging their supporters to vote by mail."  (Joint Stip. at 9.) As any increase in educational efforts would be borne by both major parties, the record does not reflect that injunctive relief would result in increased effort solely by ORP.  I would find the trial court did not abuse its discretion in determining appellees established that the public interest would be served by the granting of an injunction.

**Conclusion**

{¶ 99}  Ohio voters have a "strong interest in exercising the 'fundamental political right' to vote."  *Purcell* at 4, quoting *Dunn* at 336.  " 'That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful.' " *Obama for Am.* at 437, quoting *Hunter v. Hamilton Cty. Bd. of Elections*, 635

---

[16] *Supra* at fn 9.

F.3d 219, 244 (6th Cir.2011). For the reasons outlined above, I concur in part and respectfully dissent in part. I would affirm both the September 15, 2020 grant of appellees' motion for declaratory judgment as well as the September 16, 2020 grant of appellees' motion for preliminary injunction.

———————————